# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PANAMA CITY DIVISION

**UNITED STATES OF AMERICA**

**v.**                              **Case No.  5:08cr22/RS/CJK**
                                    **5:10cv155/RS/CJK**

**ELIJAH JAMES CHISOLM**
_____/

## REPORT AND RECOMMENDATION

This matter is before the court upon defendant's motion to vacate, set aside, or correct sentence (doc. 181), filed pursuant to 28 U.S.C. § 2255.  The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and NORTHERN DISTRICT OF FLORIDA LOCAL RULE 72.2(B).  Having conducted a careful review of the record and the arguments presented, the undersigned concludes that the motion should be denied.

### BACKGROUND AND PROCEDURAL HISTORY

The defendant, Elijah James Chisolm (a/k/a "Jamie"), and co-defendants Jonathan Cellen Bolware (a/k/a "Nail") and Floyd Kimball, were charged with, between on or about April 17, 2006 and June 3, 2008, conspiring to distribute and possession with intent to distribute more than fifty grams of a mixture and substance containing cocaine base (count I) in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii) and 846.  (Doc. 35, p. 1).  The defendant and co-defendant Bolware were separately charged with, on or about July 20, 2006, knowingly and intentionally distributing more than fifty grams of a mixture and substance containing cocaine base

(count II) in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iii) and 18 U.S.C. § 2; and, on or about August 14, 2006, knowingly and intentionally distributing more than fifty grams of a mixture and substance containing cocaine base (count IV) in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iii) and 18 U.S.C. § 2. (Doc. 35, pp. 2-3). Individually, the defendant was charged with, on or about April 10, 2008, knowingly and intentionally distributing more than five grams of a mixture and substance containing cocaine base (count V) in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii); on or about April 11, 2008, knowingly and intentionally distributing more than five grams of a mixture and substance containing cocaine base (count VI) in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii); and, on or about April 24, 2008, knowingly and intentionally distributing a mixture and substance containing cocaine (count VII) in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). (Doc. 35, p. 3). The defendant was found guilty of all counts following a jury trial (doc. 122), and the district court sentenced him to a term of life imprisonment on counts I, II, V, and VI (the terms to run concurrently), and 360 months imprisonment on count VII (the term to run concurrently to all other counts). (Doc. 140, p. 3).

The evidence of guilt in this case was substantial. On June 30, 2008, co-defendant Bolware entered into a plea and cooperation agreement with the government. (Doc. 63). At trial, co-defendant Bolware detailed the beginnings of the drug dealing operation with the defendant.[1] (PSR ¶¶ 13-15). Bolware testified that following his release from prison in Spring 2006, the defendant approached him and

---

[1] References to the presentence investigation report will be by "PSR" followed by the paragraph number.

proposed they enter into the drug business together. (PSR ¶ 13). Over the next two years, Bolware and the defendant purchased over fifty kilograms of powder cocaine. (PSR ¶ 13). Bolware and the defendant were "50-50 partners," with each individual having a unique role in the drug dealing enterprise. (PSR ¶ 14). The defendant controlled the supply of drugs and was usually the one to deal directly with the drug suppliers. (PSR ¶ 14). On the other hand, co-defendant Bolware transported, cooked, and sold the drugs. (PSR ¶ 14). Bolware also testified the defendant had been dealing drugs for over ten years. (PSR ¶ 15).

Co-defendant Kimball also entered into a plea and cooperation agreement with the government. (Doc. 59). During his testimony at trial, Kimball testified that the defendant had been involved with drugs for between twelve and fifteen years. (PSR ¶ 16). Co-defendant Kimball was an ancillary party to Bolware and the defendant's drug dealing operation. Kimball observed Bolware and the defendant cook cocaine base in Kimball's residence between 50 and 100 times. (PSR ¶ 16). Co-defendant Kimball would clean and store glassware used in the manufacture of the cocaine base and would, on occasion, act as a lookout during drug deals. (PSR ¶ 16). In addition to these responsibilities, Kimball, in at least one instance, delivered drugs for Bolware and the defendant, and occasionally tested the quality of the cocaine base by smoking some. (PSR ¶ 16).

A large amount of evidence was acquired through the use of confidential informants making controlled purchases of drugs from the defendants. (PSR ¶¶ 10-12). These confidential informants contacted co-defendant Bolware by telephone to arrange for the purchase of the drugs. (PSR ¶ 10). On July 20, 2006, following a

telephone call to co-defendant Bolware, a police informant[2] met with the defendant and bought 55.2 grams of cocaine base for $1200. (PSR ¶ 11). Co-defendant Kimball confirmed that the defendant made the July 20th drug sale. (PSR ¶ 16). Five days later, on July 25, 2006, co-defendant Bolware sold the informant 62.7 grams of cocaine base for $1200, in clear view of law enforcement. (PSR ¶ 11). On August 14, 2006,[3] co-defendant Kimball directed an informant to leave $1200 on the porch of a building in exchange for a package containing 71 grams of cocaine base. (PSR ¶ 11). Co-defendant Bolware testified that the drugs purchased in the three 2006 drug buys all originated from the defendant's own drug contacts. (PSR ¶ 15). In April 2008, a separate informant[4] conducted three additional drug purchases of cocaine and cocaine base directly from the defendant. (PSR ¶ 12). On April 10, this separate informant purchased 19.6 grams of cocaine base; on April 11, the informant purchased 20.5 grams of cocaine base; and, on April 24, the informant purchased 12.1 grams of cocaine powder, all from the defendant. (PSR ¶ 12).

---

[2] The informant who made the three controlled purchases in 2006 is named Jarvarus Taylor. (PSR ¶ 17). Taylor testified that he had previously purchased drugs from the defendant in 1997. (PSR ¶ 17).

[3] The date of August 14, 2008, contained in the presentence investigation report, appears to be a typo as the defendant was taken into custody on May 8, 2008 (PSR ¶ 6), and the superseding indictment was filed on June 3, 2008. (Doc. 35). The undersigned believes the correct date is August 14, 2006, a date which would make the drug purchase consistent with the facts of the case and the convicted crimes.

[4] The informant who made the three controlled purchases directly from the defendant in 2008 is named Dewayne Lamar Johnson. (PSR ¶ 18). Johnson testified that he had purchased cocaine base from the defendant between ten and fifteen times prior to becoming an informant. (PSR ¶ 18). These drug buys were typically for an amount of cocaine base worth $200 to $300. (PSR ¶ 18).

At trial, Terry Wayne McCloud testified that after Bolware was released from prison in Spring 2006, McCloud would buy crack cocaine from Bolware and the defendant. (Doc. 160, pp. 135-36). McCloud stated that he often bought four to five "cookies"[5] of crack cocaine from the defendants (doc. 160, p. 135) and that, in total, he bought crack cocaine from the defendants about twenty times at their duplex and several more times in front of a barber shop. (Doc. 160, p. 138). The majority of the duplex purchases occurred when both Bolware and the defendant were present. (Doc. 160, p. 138). McCloud testified that at these buys, Bolware could be seen cooking the cocaine and the defendant would be the one counting the money used to purchase the cocaine. (Doc. 160, pp. 138-39).

Another individual, Kelvin Dion Smith, testified that between June 2006 and January 2007, he purchased crack cocaine from Bolware and the defendant behind Bolware's grandmother's house. (Doc. 160, pp. 111-12). Smith stated that he bought "circles" of crack cocaine, twice from the defendant and once from Bolware. (Doc. 160, p. 112). In all, Smith recalled that he bought twelve circles directly from the defendant and three circles directly from Bolware. (Doc. 160, p. 113).

## DEFENDANT'S CLAIMS

Pursuant to 28 U.S.C. § 2255, defendant timely filed the instant motion to vacate, set aside, or correct sentence (doc. 181), asserting fifteen grounds on which he believes he is being held in violation of the Constitution, laws, or treaties of the United States. The government filed a response in opposition (doc. 191), and the defendant filed a reply (doc. 194). Defendant contends counsel rendered ineffective

---

[5] An individual cookie contains between twenty-one and twenty-three grams of crack cocaine. (Doc. 160, p. 136).

assistance by failing to: (1) object to the systematic exclusion of African-Americans and striking the only potential African-American juror; (2) conduct constitutionally adequate voir dire of jury members; (3) object to government vouching and bolstering of government witnesses; (4) object to improper drug amounts being attributed to the defendant; (5) object to insufficient evidence of crack cocaine at sentencing; (6) object to the composition of the jury pool and failure to timely file a motion to strike the venire due to its racial disparity and fair cross-section violation; (7) raise a *Batson* claim on appeal; (8) raise racial disparity and fair cross-section claims regarding jury selection on appeal; (9) object to the government's improper comments during trial and in closing arguments; (10) argue that the United States District Court for the Northern District of Florida lacked subject matter jurisdiction to impose an enhanced sentence under U.S.S.G. §4B1.1(a) where the government failed to obtain and file with their § 851(a)(1) enhancement notice and court record(s) certified copies of the charging instrument, and where the pleadings read by the court at sentencing were "vague" on their face; (11) raise the sentencing disparity between "crack cocaine" and "powder cocaine," because the defendant would have benefitted from the Supreme Court's ruling in *Kimbrough v. United States*, 128 S. Ct. 558 (2007); (12) inform the defendant of the government's plea offer; (13) timely raise an § 851 challenge under § 3559(c) in light of *United States v. Sanchez*, 586 F.3d 918 (11th Cir. 2009).  He devotes another point to claiming counsel's cumulative errors violated his Sixth Amendment right to effective assistance of counsel.  (Doc. 181, pp. 4-13).  Finally, defendant argues that his claims concerning 21 U.S.C. § 851 are jurisdictional in nature and therefore not subject to procedural default.  (Doc. 182, p. 32).  The undersigned will address the jurisdictional argument under ground fifteen.

ANALYSIS

As a preliminary matter, the court notes certain general rules applicable in § 2255 proceedings following direct appeals, as well as the distinction between review under § 2255 and direct appeal. "Generally speaking, an available challenge to a criminal conviction or sentence must be advanced on direct appeal or else it will be considered procedurally barred in a § 2255 proceeding." *Mills v. United States*, 36 F.3d 1052, 1055 (11th Cir. 1994). "A ground of error is usually 'available' on direct appeal when its merits can be reviewed without further factual development." *Id.* "A claim not raised on direct appeal is procedurally defaulted unless the petitioner can establish cause and prejudice for his failure to assert his claims on direct appeal." *McCoy v. United States*, 266 F.3d 1245, 1258 (11th Cir. 2001). "Further, a § 2255 movant cannot argue as the causal basis for his failure to advance an argument on direct appeal that the argument only became known to the movant due to subsequent developments in the law." *Castro v. United States*, 248 F. Supp. 2d 1170, 1174 (S.D. Fla. 2003) (*citing McCoy*, 266 F.3d at 1258).

Regarding the important difference between a § 2255 collateral challenge and direct review, "[i]t has long been settled law that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *See United States v. Addonizio*, 442 U.S. 178, 184 (1979). Relief under § 2255 should be granted only if the challenged sentence resulted from "a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure." *See Hill v. United States*, 368 U.S. 424, 428 (1962); *see also Richards v. United States*, 837 F.2d 965, 966 (11th Cir. 1988) ("Relief under 28 U.S.C. § 2255 'is reserved for transgressions of

constitutional rights and for that narrow compass of other injury that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice.'" (*quoting United States v. Capua*, 656 F.2d 1033, 1037 (5th Cir. 1981))).

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "First, the defendant must show that counsel's performance was deficient[,]" which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* "Second, the defendant must show that the deficient performance prejudiced the defense[,]" which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* In applying *Strickland*, the court may dispose of an ineffective assistance of counsel claim if the defendant fails to carry his burden on either of the two prongs. *See* 466 U.S. at 697.

*Ground One - Systematic Exclusion of African-American Jurors*

Defendant first argues that trial counsel provided ineffective assistance by "failing to object to the systematic exclusion of African-American [sic] and Striking the only African-American." (Doc. 181, p. 4). The source list for race/gender composition of the venire shows that only one prospective juror out of thirty-five was "black," juror number twenty-seven. (Doc. 182, p. 41). Defendant's own counsel proceeded to strike the only prospective black juror, a fact pointed out by the government. (Docs. 158, p. 19; 182, p. 3). After being told she struck the only potential black juror, defense counsel stated "I didn't know." (Doc. 158, p. 19). Defendant contends that the single black juror–struck by defense counsel–had

previously been a juror in a federal drug case and, in that case, the jury could not reach a verdict. (Doc. 182, p. 4). As such, defendant claims, "there is a reasonable probability that [the struck black juror] would have voted not guilty and cause [sic] an [sic] hung jury on all counts." (Doc. 182, p. 4). In response, the government claims that the struck black juror was a corrections officer, and therefore, defense counsel exercised "'sound trial strategy'" by excluding a juror with that background.[6] (Doc. 191, p. 4). Review of the confidential juror questionnaire verifies the struck juror had a son that was a corrections officer.[7]

Logically, defendant's arguments are misplaced. Because a juror voted a certain way in an entirely distinct trial, with an entirely different set of facts, does not indicate that the juror would vote that same way in another trial. Moreover, to the extent defendant argues the struck juror would be less willing to convict the defendant because they are both African-American, such an argument is completely unsupported and pure speculation (not to mention racially biased). The evidence in the instant case was overwhelming with both of defendant's co-conspirators testifying against him and numerous informants testifying that they bought drugs from the defendant. Defense counsel acted reasonably in striking a juror whose relation to a corrections officer could, from counsel's perspective, have resulted in the juror being

---

[6] Defendant posits that trial counsel told him "[b]lacks are not good juros [sic] and was [sic] unable to judge the facts." (Doc. 182, p. 3). Defendant's statement that he attributes to trial counsel is conclusory and unsupported by any citation to actual evidence.

[7] Given the confidential nature of juror questionnaires, the undersigned has reviewed such information and attests to the validity of the information contained in this Report and Recommendation.

more likely to convict the defendant.[8]  *See Newland v. Hall*, 527 F.3d 1162, 1184 (11th Cir. 2008) ("[The court] consider[s] whether there was any reasonable justification for the attorney's conduct.  Thus, the 'petitioner must establish that no competent counsel would have taken the action that his counsel did take.'" (citations omitted)).  Defense counsel's exclamation that she "didn't know" she had struck the sole black juror does not indicate error or prejudice to defendant's case, because such a statement does not change the fact that the stricken venire person had a close relationship with a law enforcement officer.  Defendant has shown neither that defense counsel acted deficiently by striking the lone "black juror," nor that but for counsel's deficient performance the outcome of the proceeding would have been different.  *See Strickland*, 466 U.S. at 694.  Accordingly, defendant's first ground lacks merit.

*Ground Two - Failure to Conduct an Adequate Voir Dire of Jury*

Defendant next argues that trial counsel provided ineffective assistance by failing to conduct a meaningful voir dire of the jury and the "presence of juror Coppola, juror no. 24 who attend [sic] church with Ricky Ramie and know [sic] him for a couple of years[.]"  (Doc. 182, p. 6).  Defendant further claims that juror Coppola was the jury's foreperson, and that defense counsel failed to conduct an

---

[8] Defendant cites *Wiggins v. Smith*, 539 U.S. 510 (2003), for the proposition that the court has a "duty to ask the attorney to provide an explanation for the challenged conduct and a duty to make a determination whether the attorney's explanation is reasonable."  (Doc. 194, p. 3).  The record and pleadings contain no evidence indicating the juror was struck due to her race.  Defendant bears the burden of showing "'that, but for counsel's unprofessional errors, the result of the proceeding would have been different'" *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000). (citations omitted).  Defendant has put forward no evidence–outside of unsupported conjecture–that the striking of the sole black juror changed the outcome of the trial.

adequate voir dire of juror Coppola in order to expose the juror's relationship to a prosecution witness and feelings towards drug dealers who sell crack cocaine. (Doc. 182, pp. 6-7).

"The purpose of voir dire is to enable the defendant to evaluate the prospective jurors and select a fair and impartial jury." *United States v. Vera*, 701 F.2d 1349, 1355 (11th Cir. 1983) (*citing United States v. Shavers*, 615 F.2d 266, 268 (5th Cir. 1980)). A voir dire "need only provide 'reasonable assurance that prejudice will be discovered if present.'" *Id*. (*quoting United States v. Holman*, 680 F.2d 1340, 1344 (11th Cir. 1982)). Juror number twenty-four, Mrs. Coppola, admitted during voir dire that she recognized government witness Ricky Ramie's name:

> Juror Coppola: Kathy Coppola, Juror No. 24. And I recognize Ricky Ramie's name. We attend church together.
>
> [Judge Smoak]: How long have you known him?
>
> Juror Coppola: A couple of years probably. I mean I don't know him well.
>
> [Judge Smoak]: Okay. So we would not be putting you on the spot as a juror if he were a witness in this case?
>
> Juror Coppola: I don't think so, no.

(Doc. 158, p. 5). Additionally, District Judge Smoak inquired into whether the jurors had any "preconceived notion[s] that would cause [them] to believe the testimony of law enforcement officer[s] automatically, or over other types of witnesses," or if the jurors "would not be able to follow [Judge Smoak's] instructions on how you are to determine the believability of all the witnesses." (Doc. 158, p. 10). Juror Coppola did not indicate such a belief.

Defendant's claim that juror Coppola was not adequately questioned concerning her relationship with witness Ramie is without support. District Judge Smoak clearly inquired into her relationship with the witness and questioned whether juror Coppola's relationship to the witness would impair her ability to be a juror in the case. Given juror Coppola's answer, defense counsel acted reasonably in not further inquiring into the relationship. *See Holladay v. Haley*, 209 F.3d 1243, 1253 n.6 (11th Cir. 2000) ("A tactical decision is ineffective only 'if it was so patently unreasonable that no competent attorney would have chosen it.'" (*quoting Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983)). Defendant puts forward no evidence supporting his contention that juror Coppola had a closer relationship with witness Ramie than she indicated. Additionally, despite defendant's claim, juror Coppola was not the foreperson of the jury. (Doc. 164, pp. 4-5).

Plaintiff also argues that trial counsel should have asked the prospective jurors about their feelings towards a defendant who is accused of selling crack cocaine. (Doc. 182, pp. 6-7). Specifically, defendant references a statement in which defense counsel admits fault for not inquiring into a prospective juror's history with crack cocaine. (Doc. 182, p. 7). Defense counsel stated, "I have a feeling with the type of testimony that's going to come out about drug use, and if [juror No. 50] knows anything about crack, it's so addictive - - and we didn't ask, and it was my fault, what kind of drug, but I didn't want to batter - -." (Doc. 158, p. 17). Defense counsel was referencing juror number fifty's answer on the juror questionnaire in which she indicated drugs had affected her family. (Doc. 158, p. 15). Defense counsel subsequently struck–for cause–juror number fifty. (Doc. 158, p. 17). While defense counsel failed to inquire into which specific drug had affected juror No. 50's family

members, the striking of a juror who had family members negatively impacted by drug use is a completely reasonable decision. To the extent defendant claims defense counsel should have better inquired into every juror's relationship with drugs, such a claim is meaningless because the confidential juror questionnaire contained a supplement asking the prospective jurors whether "anyone in [their] immediate family, or your close friends been affected in any way by illegal drugs? If so, please discuss the type of drugs, what occurred, when, and whether you feel you or your family and friends were treated fairly by the judicial system." As such, defense counsel was aware of any potential bias prospective jurors may have had towards the defendant and the allegations against him. Accordingly, defendant' second claim must fail.

*Ground Three - Counsel's Failure to Object to the Government's Vouching*

Defendant next claims the government improperly vouched for the credibility of several government witnesses, and defense counsel did not object to such vouching. (Docs. 181, p. 6; 182, pp. 7-8). Defendant cites several instances in which the government asked witnesses what obligations they have under their plea agreement and whether that witness was telling the truth. (Doc. 182, pp. 9-10).

"When reviewing a defendant's "'vouching'" claim, we examine whether (1) the prosecutor placed the prestige of the government behind the witness by making explicit personal assurances of the witness's credibility, or (2) the prosecutor implicitly vouched for the witness's credibility by implying that evidence not formally presented to the jury supports the witness's testimony." *United States v. Arias-Izquierdo*, 449 F.3d 1168, 1177-78 (11th Cir. 2006) (*citing United States v. Cano, 289 F.3d 1354, 1365 (11th Cir.2002); Castro*, 89 F.3d at 1457). The prohibition on

vouching is not a blanket bar; instead, the law aims to limit the prosecution from using the authority of the government or non-introduced evidence to add credibility to a witnesses's testimony. *United States v. Hernandez*, 921 F.2d 1569, 1573 (11th Cir. 1991) ("The prohibition against vouching does not forbid prosecutors from arguing credibility, which may be central to the case; rather, it forbids arguing credibility based on the reputation of the government office or on evidence not before the jury.").

In defendant's referenced statements, the government is not vouching for various witnesses' testimony. Instead, the government is demonstrating for the jury that the government witnesses are obligated under their plea agreements to present truthful testimony and are not perjuring themselves due to their plea agreements. For example, the defendant repeatedly references a statement made by the government in its closing, "If [government witness Kelvin Smith] [is] willing to make it up, he could make up two-six kilogram deals. If he's willing to make it up. You decide." (Doc. 160, p. 235). The previous statement was an effort by the government to argue for the credibility of its witnesses, many of whom were former or current drug users or dealers who were testifying according to plea agreements. The government was not arguing credibility based on the reputation of the government or evidence not before the jury, but instead was attempting to make the point that such witnesses were not making their testimony up to please the government.

Additionally, in its opening statement, the government indicated the jurors had the responsibility to "decide whether [a government witness] was telling the truth." (Doc. 159, p. 27). In its closing argument, the government cautioned the jury to look "carefully" at cooperating witnesses' testimony. (Doc. 160, p. 229). Defendant

misconstrues what a "vouching claim" is. In reality, the government was merely seeking to respond to defense counsel's cross-examination and efforts to discredit the testimony at issue. Defendant has neither put forward a viable claim of improper vouching, nor demonstrated defense counsel's conduct was unreasonable and that but for such errors the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694. Accordingly, defendant's third ground fails.

*Claim Four - Counsel's Failure to Raise Apprendi v. New Jersey*

Defendant next argues that defense counsel erred by failing to raise *Apprendi v. New Jersey*, 530 U.S. 466 (2000), at trial or sentencing. (Doc. 182, p. 10). Defendant claims that had defense counsel argued that the jury has the obligation of determining drug amount and not the judge, "he would not have been deprived of his Sixth Amendment right to a jury trial." (Doc. 182, p. 10). Defendant again misconstrues the actual events of his trial. Review of the jury's verdict form evidences the jury found him guilty of counts one, two, five, six, and seven, and also determined the amount of cocaine or cocaine base defendant was guilty of distributing for those counts. (Doc. 122). Given the jury's findings, Judge Smoak sentenced the defendant to life for counts one, two, five, and six. (Docs. 139, 140). The government filed an Information and Notice of Intent (doc. 41) indicating the government would seek various sentence enhancements against the defendant. (PSR ¶ 7). The result of these enhancements, if defendant were convicted of counts one and two, would be a mandatory term of life imprisonment. (Doc. 41, pp. 2-3); *see also Berry v. United States*, 281 F. App'x 967, 968 (11th Cir. 2008) ("Under 21 U.S.C. § 841(b)(1)(A)(iii), an individual who distributes 50 grams or more of a substance containing 'cocaine base,' after 2 or more prior felony drug offenses have

become final shall be sentenced to a mandatory term of life imprisonment."). If defendant were convicted of counts five and six, he would be subject to a term of ten years to life imprisonment; if convicted of count seven, defendant would face a term of up to thirty years imprisonment. (Doc. 41, p. 3). Defendant was convicted of counts one, two, five, six, and seven, and had two prior felony drug offenses. (PSR ¶ 35). Thus, Judge Smoak properly imposed a mandatory sentence of life imprisonment. The *Apprendi* argument misses the mark.

Accordingly, defendant's fourth claim fails.

*Ground Five - Counsel's Ineffective Assistance for Failure to Object to Crack Cocaine at Sentencing*

Defendant asserts that, for sentencing purposes, the government must prove by a preponderance of the evidence that the cocaine defendant was charged with was crack cocaine. (Doc. 182, pp. 11-12). Defendant argues the government did not prove that the cocaine he was charged with was crack cocaine, and defense counsel therefore should have objected to defendant's "more severe 'crack cocaine' sentence." (Doc. 182, p. 11). Government witness William Goodlin, certified at trial as an expert in the field of drug analysis, conducted a variety of tests on government exhibits one, four, fourteen, seventeen, and eighteen, all found in defendant's possession, and determined the substances to contain cocaine base. (Doc. 159, pp. 160-65). Another expert government witness, forensic chemist Elizabeth Adkins, testified that government exhibit sixteen contained cocaine hydrochloride.[9] (Doc.

---

[9] Defendant mistakenly infers that because government witness Adkins testified the substance she analyzed (government exhibit sixteen) contained cocaine hydrochloride, all the substances contained cocaine hydrochloride. Witness Goodlin testified government exhibits one, four, fourteen, seventeen, and eighteen, all contained cocaine base. (Doc. 159, pp. 160-65).

159, p. 176). Additionally, defendant's co-defendants and various other witnesses and informants testified that defendant was involved with the manufacturing and distribution of crack cocaine. (Docs. 159, pp. 131-35; 160, pp. 61-76, 111-15, 134-45, 166-74).

Defendant was charged in counts one and two, respectively, with conspiring to distribute, and knowingly and intentionally distributing, in excess of fifty grams of a mixture and substance containing cocaine base, commonly known as "crack cocaine." (Doc. 35). In counts five and six, defendant was charged with–on two different dates–knowingly and intentionally distributing more than five grams of a mixture and substance containing cocaine base, commonly known as "crack cocaine." (Doc. 35, p. 3). The jury found the defendant guilty of these charges and indicated the amounts of cocaine base distributed by defendant. (Doc. 122). Given Mr. Goodlin's determination that the substances he tested contained cocaine base and the numerous witnesses who indicated defendant was involved in the distribution of crack cocaine, defendant cannot be prejudiced by counsel's failure to question whether certain substances were crack cocaine. *See Berry*, 218 F. App'x at 969 ("[Defendant] cannot show he was prejudiced by his trial counsel's failure to challenge whether the substance he distributed was crack cocaine, because the evidence demonstrated the substance was crack cocaine."). Accordingly, defendant's fifth claim fails.

*Ground Six - Counsel's Ineffective Assistance For Failure to Object to the Composition of the Jury Pool and Failure to File a Motion to the Strike the Venire*

Defendant next takes issue with the composition of the jury pool for his trial. (Doc. 182, p. 14). As discussed previously, the juror pool for defendant's trial

consisted of one possible "black" juror and thirty-four "white" jurors. (Docs. 158, p. 19; 182, p. 41). Defendant again argues defense counsel provided ineffective assistance by striking the sole black juror. This argument has already been addressed and is without merit. *See supra* pp. 8-10.

Defendant also claims that the jury selection procedure used by the United States District Court for the Northern District of Florida, Panama City Division, failed to draw a potential jury pool from a "fair cross-section" of the community. (Doc. 182, p. 15). Specifically, defendant states African-Americans residing in "the Panama City District" were underrepresented in the venire. (Doc. 182, p. 14). Defendant frames such a contention as ineffective assistance by arguing defense counsel erred by failing to file a motion to strike the venire or explain to the court the prejudice imposed upon the defendant by a venire that underrepresented African-Americans. (Doc. 182, pp. 15-16).

The Sixth Amendment affords a criminal defendant who is entitled to a jury, a jury selected from "a fair cross section of the community." *Duren v. Missouri*, 439 U.S. 357, 358-59 (1979). While not explicit in the Sixth Amendment, the fair cross section venire requirement "is derived from the traditional understanding of how an 'impartial jury' is assembled. That traditional understanding includes a representative venire, so that the jury will be . . . 'drawn *from* a fair cross section of the community.'" *Holland v. Illinois*, 493 U.S. 474, 480 (1990) (*quoting Taylor v. La.*, 419 U.S. 522, 527 (1975)); *see also United States v. Grisham*, 63 F.3d 1074, 1078 (11th Cir. 1995) ("The Sixth Amendment guarantees a criminal defendant the right to be indicted and tried by juries drawn from a fair cross-section of the community."). A defendant, however, is not entitled to a "'jury composed in whole or in part of persons of his own race[,]"

*Batson v. Kentucky*, 476 U.S. 79, 85 (1986) (*quoting Strauder v. West Virginia*, 100 U.S. 303, 305 (1879)), a jury "of any particular composition," *Taylor*, 419 U.S. at 538, or a venire that is a "substantially true mirror of the community." *Barber v. Ponte*, 772 F.2d 982, 997 (1st Cir. 1985). Instead, "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Taylor*, 419 U.S. at 538.

To demonstrate a prima facie violation of the Sixth Amendment's fair cross-section requirement, a defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren*, 439 U.S. at 364. Here, the government concedes that African-Americans are a distinctive group within the community, but contests that representation of African-Americans in venires is not fair and reasonable, or that such underrepresentation–if any exists–is due to systematic exclusion of African-Americans from the jury selection process. (Doc. 191, p. 6). In assessing whether representation of African-Americans in the venire was fair and reasonable, the court compares the percentage of African-Americans in the division eligible for jury service with the percentage of African-Americans in the jury pool for the division. *United States v. Carmichael*, 560 F.3d 1270, 1280 (11th Cir. 2009). "If the absolute disparity between those two percentages is 10 percent or less, the second element is not satisfied." *Grisham*, 63 F.3d at 1078-

79.  In the Panama City Division, the source list for fiscal year 2008 (the time period in which defendant's trial occurred) indicates that African-Americans composed 13.52 percent of the total population for that division.[10]  African-Americans composed 10.01 percent of the source list for the jury pool.  Thus, the absolute disparity between the two percentages is only 3.51 percent, well below the required 10 percent threshold needed to establish a prima facie case of a Sixth Amendment violation.  Because plaintiff has not established that representation of African-Americans in the Panama City division is not fair and reasonable, he has failed to make a prima facie claim for violation of the Sixth Amendment.  *See United States v. Pepe*, 747 F.2d 632, 649 (11th Cir. 1984) ("If a defendant fails to establish any of these elements he has failed to establish a prima facie violation of the [S]ixth [A]mendment.").  As such, defense counsel did not provide ineffective assistance for failing to object to the composition of the jury pool and for not moving to strike the venire.  Accordingly, defendant's sixth ground fails.

*Ground Seven - Failure of Appellate Counsel to Raise a Batson Claim on Appeal*

Defendant next takes issue with the performance of his appellate counsel. Defendant argues appellate counsel erred by failing to raise a *Batson*[11] claim on appeal.  (Doc. 182, p. 17).  Defendant does not allege the government issued a

---

[10] The undersigned has been provided the jury wheel information for both the Panama City division and the Northern District as a whole.  The traditional practice for this district is for the undersigned to review the relevant records and attest to their accuracy.  Because information relating to jurors, jury wheels, and jury records are regulated fairly closely, the undersigned declines to upload this information to the docket.

[11] In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court held that the equal protection clause forbids the government from challenging potential jurors solely on the basis of their race.

discriminatory peremptory strike, but instead argues that defense counsel herself effected a *Batson* violation by striking the sole black prospective juror.  (Doc. 182, p. 18).  Defendant asserts that  he asked defense counsel why she struck the black juror and defense counsel responded, "black[s] are not good juror[s] and was [sic] unable to judge the facts." (Doc. 182, p. 19).  Defendant puts forward no evidence supporting this conclusory assertion.  Defendant continues on to suggest that defense counsel colluded with the government to "cherry-pick" jurors thereby guaranteeing defendant would be convicted.  (Doc. 182, p. 19).  Again, this assertion is completely unsupported.  Defendant's argument–in a nutshell–is that the government, or possibly the court itself, should have raised a *Batson* challenge against defense counsel who defendant claims struck juror twenty-seven because she was African-American.[12]

As previously discussed herein, defendant's claim that defense counsel provided ineffective assistance or violated his Sixth Amendment rights by striking the sole black juror is without merit.  *See supra* pp. 8-10.  Moreover, defendant has put forward no evidence indicating defense counsel committed a *Batson* violation.  In fact, the evidence of record indicates defense counsel had a legitimate reason for striking the sole black juror–her son was a corrections officer.  Defendant "bears the burden of

---

[12] Defendant cites *United States v. Huey*, 76 F.3d 638 (5th Cir. 1996), to support his contention that  this court should reverse his conviction because of defense counsel's alleged *Batson* violation.  (Doc. 194, p. 8).  In *Huey*, co-defendant's counsel used all five of his peremptory challenges to strike African-Americans from the venire.  76 F.3d at 641.  The defendant in *Huey* established a *prima facie* case that co-defendant's counsel exercised peremptory challenges on the basis of race, and co-defendant's counsel failed to offer any reason–race-neutral or otherwise--for the strike.  76 F.3d at 641.  In the instant case, defendant has not made a *prima facie* showing of racial discrimination, and the record supports the assertion that defense counsel struck the juror because of her relation to law enforcement.

establishing facts sufficient to support an inference of racial discrimination." *Central Ala. Fair Housing Center, Inc. v. Lowder Realty Co., Inc.*, 236 F.3d 629, 636 (11th Cir. 2000). Defendant, however, has put forward no evidence suggesting that juror number twenty-seven was struck on the basis of her race. Given that defense counsel did not commit a *Batson* violation, appellate counsel did not provide ineffective assistance by failing to raise the claim on appeal. *See Diaz v. Sec. for the Dept. Of Corr.*, 402 F.3d 1136, 1145-46 (11th Cir. 2005) ("Appellate counsel would not have prevailed on [the] argument, and nonmeritorious claims that are not raised on appeal do not constitute ineffective assistance of counsel." (citations omitted)). Thus, defendant's seventh claim fails.

*Ground Eight - Failure of Appellate Counsel to Raise a Claim of Racial Disparity and Fair Cross Section Claims Regarding Jury Selection on Appeal*

Defendant again argues that the jury selection procedure of the United States District Court for the Northern District of Florida, Panama City Division, underrepresents African-Americans in the jury pool and does not represent a fair cross section of the community. (Doc. 182, pp. 20-21). Defendant is merely reasserting the same claim he has previously raised in ground seven and masking it as a different claim by faulting appellate counsel for failing to raise the issue on appeal. As previously discussed, the Panama City Divisions's jury selection procedure does not underrepresent African-Americans in the jury pool. *See supra* pp. 17-20. Because such a claim lacks merit, appellate counsel did not provide ineffective assistance by failing to raise it on appeal. *See Diaz*, 402 F.3d at 1145-46 ("[N]onmeritorious claims that are not raised on appeal do not constitute ineffective assistance of counsel." (citations omitted)). Thus, defendant's eighth claim fails.

*Ground Nine - Defense Counsel's Failure to Object to the Government's Improper Comments During Trial and Closing Arguments*

Defendant further claims that defense counsel provided ineffective assistance by failing to object to the government's improper remarks during trial and closing argument. (Doc. 182, p. 22). Specifically, defendant takes issue with the government's comments concerning government witness and co-conspirator Kimball. Defendant points to an exchange in which the government asked Kimball "[w]ho was in charge of going and fetching the glassware so the crack could be cooked[,]" to which Kimball responded "I was." (Doc. 160, p. 168). Defendant claims this exchange evidences the government's intention to inflame the racial prejudices of the all white jury. (Doc. 182, pp. 22-23). Defendant also points to sections of testimony in which Kimball testified about the work he did around his apartment for an African-American woman named Teresa, and how in exchange for his help with the drug business he was rewarded with drugs as compensation. (Doc. 160, pp. 171-72). Defendant further notes that the government, throughout the trial, "persistently identified the defendant[] as the person who treated Mr. Kimball as a Dog [sic] and crack slave . . . ." (Doc. 182, p. 23). Defendant also takes issue with how the government discussed Kimball in its closing:

> Look at Mr. Kimball. A pitiful wreck. A man who is being forced in some fashion to confront the life that he's lived and the damage he's wrought on himself, a man who was living in an itty-bitty trailer and getting by hand to mouth. You heard him. You decide. When he said, "I didn't do much, but I helped, and that one time, I pointed out the dope, told them where to leave the money, and otherwise I took care of the glassware and I let them cook crack in my trailer, and

I got - - I got high off of it. That's what I got out of it."

(Doc. 160, pp. 236-37). Finally, defendant points to the government's statement in its closing that, "[t]hese are all men with bad criminal records. They are multi-convicted felons. With the exception of Mr. Kimball, my hearing was that regular honest work hadn't been a part of any of their lives. And you're entitled to consider that." (Doc. 160, p. 230). Defendant argues the previous statements "inflame[d] the all white jury against [defendant] who is black and to protray [sic] Mr. Kimball as victim of those bad African-American [sic]." (Doc. 182, p. 24). Defendant also claims these various comments served to show the jury how Kimball, a white man, was "force[d] to work as a crack slave for all these Black American people." (Doc. 182, pp. 22-23). Pursuing this interesting logic, defendant posits that defense counsel's failure to object to these comments prejudiced him and his sentenced should be reversed.

Kimball, on at least one occasion, helped deal crack cocaine. (Doc. 160, p. 78). Kimball testified he used mostly methedrine and cocaine. (Doc. 160, p. 163). Kimball had used various drugs–methedrine, cocaine, LSD, PCP, TCH, marijuana, and alcohol–since 1980. (Doc. 160, p. 183). He used crack cocaine from 1980 through 2008. (Doc. 160, p. 183). In 1996, he was convicted of dealing in stolen property, two counts of burglary, grand theft, and possession of controlled substances. (Doc. 160, p. 163). In 2000, he was convicted of solicitation to purchase a controlled substance and, in 2002, he was convicted of twelve counts of passing worthless checks. (Doc. 160, p. 163). On direct examination, the government discussed with Kimball his plea agreement and possible sentence reduction if he provided assistance

to the government's prosecution of the defendant.  (Doc. 160, pp. 164-65).  Kimball proceeded to testify that he knew the defendant and the defendant would send him to fetch glassware so crack cocaine could be manufactured.  (Doc. 160, p. 168).  Kimball stated that the defendant "financed the cocaine business when he got out of prison . . . ."  (Doc. 160, p. 168).  Kimball also testified he saw the defendant cook the "dope up sometimes."  (Doc. 160, p. 170).

The government discussed Kimball's testimony and how he was unhappy to be testifying against the defendant, his long time friend.  (Doc. 160, p. 235).  The government also recognized the difficulty Kimball faced "admitting the destruction he has wrought on his own life . . . . [W]hat 30 years or so of drug abuse does to a man."  (Doc. 160, pp. 235-36).  The government tasked the jury with "deciding for yoursel[ves] whether [Kimball] was telling the truth when he said he . . . was assisting [the defendant] and Mr. Bolware in their drug business."  (Doc. 160, p. 237).  Defense counsel, in turn, sought to discredit Kimball's testimony.  (Doc. 160, pp. 254-55, 263-65).  Defense counsel admitted Kimball was a "good witness" who "got emotional" and showed "the rigors of his crack addiction for all these years."  (Doc. 160, p. 263). Defense counsel attempted to portray Kimball as "bitter" and someone who faced a minimum of twenty years in prison if he did not cooperate.  (Doc. 160, p. 264).

Review of the record evidences no attempt on the part of the government to inflame the jurors' racial prejudices or animosities towards an African-American defendant.[13]  The government's discussion of Kimball and his relationship with the

_____

[13] Defendant cites to a litany of cases in an effort to demonstrate the government's conduct merits reversal.  (Doc. 182, pp. 24-25).  After review, defendant's cited cases are not factually similar to the instant case.  Specifically, in the instant case, the government's statements were not

defendant are accurate representations given Kimball's own testimony. The government sought to bolster Kimball's credibility by emphasizing the role he played in the crack cocaine operation and his relationship to the defendant. Kimball is certainly a pitiful character, but discussion of his role and activities in a criminal enterprise does not show an attempt by the government to inflame racial prejudices. As such, defense counsel had no obligation to object to the government's statements. Defendant has shown neither that defense counsel acted deficiently by failing to object the government's comments nor that but for counsel's deficient performance the outcome of the proceeding would have been different. *See Strickland*, 466 U.S. at 694. As such, defendant's ninth ground fails.

*Ground Ten - District Court's Lack of Subject Matter Jurisdiction to Impose an Enhanced Sentence*

In ground ten, defendant argues that the district court lacks jurisdiction to impose an enhanced sentence under 21 U.S.C. § 851, unless "the government strictly complies with the procedures and requirements" of that section. (Doc. 182, p. 26). Defendant argues that the government "failed to obtain and file with their § 851(a)(1) enhancement notice . . . certified cop[ies] of" defendant's prior state convictions used to enhance defendant's sentence. (Doc. 182, p. 26). Defendant also faults the government for failing to "clearly indicate" in its § 851(a)(1) enhancement notice that defendant's prior state convictions are "'serious drug offenses,'" meaning, "'a[n] offense under state law that, had the offense(s) been prosecuted in a Court of the United States, would have been punishable under 21 U.S.C. § 841(b)(1)(A) and 18

_____

racially charged and did not prejudice the defendant.

U.S.C. § 3559(c)(2)(H)(ii) and (iii).'"  (Doc. 182, p. 27).  Defendant further cites *United States v. Sanchez*, 586 F.3d 918 (11th Cir. 2009), for the proposition that his prior state drug convictions "'must list or specify 5 kilograms or more of cocaine or 50 grams or more of cocaine base.'" (Doc. 182, p. 27).  Owing to these alleged deficiencies, defendant posits his prior state drug convictions are "'vague' on their face, and the Notice of Enhancement did not strictly comply with § 851(a)(1) . . . ." (Doc. 182, p. 27).

21 U.S.C. § 851 sets out the prerequisites to its operation:

> No person who stands convicted of an offense under this part shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial, or before entry of a plea of guilty, the United States attorney files an information with the court . . . stating in writing the previous convictions to be relied upon.

21 U.S.C. § 851(a)(1).  If the defendant "denies any allegation of the information of prior conviction, or claims that any conviction alleged is invalid, he shall file a written response to the information . . . . The failure of the United States attorneys to include in the information the complete criminal record of the person or any facts in addition to the convictions to be relied upon shall not constitute grounds for invalidating the notice given in the information required by subsection (a)(1) of this section. § 851(c)(1).

Here, the government filed an information and notice of intent to seek enhanced penalties (doc. 41) on June 10, 2008, seven months before defendant's trial.  Despite defendant's claims, the government was under no statutory obligation to file certified copies of defendant's prior state convictions with the notice to seek enhanced sentences or to indicate defendant's state drug convictions were "serious drug

offenses." Section 841 requires only that defendant be convicted of two or more "felony drug offenses." *See United States v. Watson*, 461 F. App'x 887, 888-89 (11th Cir. 2012) ("Section 841(b)(1)(A) provides that a defendant convicted under that section who previously has been convicted of two or more felony drugs offenses shall be sentenced to life imprisonment."). Defendant also has failed to show how his prior drug convictions were "'vague' on their face." The government cites each conviction and lists the case number, crime, and the court in which defendant was adjudicated. (Doc. 41). The government thus has complied with its obligations under § 851. *See United Stats v. Ramirez*, 501 F.3d 1237, 1240 (11th Cir. 2007) (holding that a notice of intent to seek enhancement was valid because it was filed "'before trial, or before entry of a plea of guilty,'" and "informed the defendant that the government was seeking the enhancement, and thus gave him an opportunity to challenge the convictions or adjust his trial and pleading strategy"); *see also Perez v. United States*, 249 F.3d 1261, 1266 (11th Cir. 2001) (noting that the court is tasked with inquiring "whether the information which was filed provided [the defendant] reasonable notice of the government's intent to rely on a particular conviction and a meaningful opportunity to be heard.").

Defendant also cites *United States v. Gillam*, 167 F.3d 628 (D.C. Cir. 1998), as support for his contention that the government was obligated to offer proof of defendant's prior convictions. (Doc. 182, p. 27). "After the government files an information pursuant to 21 U.S.C. § 851 identifying the prior convictions relied upon to support the 21 U.S.C. § 841(b)(1)(A) enhancement, the defendant may deny a conviction or claim that a conviction is invalid by filing a written response." *Watson*, 461 F. App'x at 888-89. At the sentencing hearing, defendant admitted to both of his

prior convictions (doc. 170, pp. 23-24), relieving the government of any further obligations.

Finally, defendant's argument that his prior state drug convictions must involve either five kilograms of cocaine or fifty grams of cocaine base in order for them to be relied upon to enhance his sentence is misdirected. Defendant cites *United States v. Sanchez*, 586 F.3d 918 (11th Cir. 2009), to support this argument, but *Sanchez* deals with sentence enhancements under 18 U.S.C. § 3559, not 21 U.S.C. § 841. As discussed before, § 841 requires only convictions of prior "felony drug offenses." For the foregoing reasons, defendant's tenth ground fails.

*Ground Eleven - Appellate Counsel's Failure to Raise the Issue of Disparity Between "Crack Cocaine" and "Powder Cocaine"*

Under ground eleven, defendant argues that appellate counsel should have raised on appeal "the issue of disparity between 'crack cocaine' and 'powder cocaine' being treated equal." (Doc. 182, p. 28). Defendant claims he would have benefitted from the United States Supreme Court's rulings in *Kimbrough v. United States*, 552 U.S. 85 (2007), and *Spears v. United States*, 555 U.S. 261 (2009). (Doc. 182, p. 28). Defendant cites these cases for the proposition that district courts can vary from the "crack cocaine" guidelines. (Doc. 182, p. 28). Unfortunately, and crippling to the logic of this argument, defendant was sentenced to a mandatory minimum sentence of life imprisonment on counts one and two.[14] The court had no jurisdiction to deviate

---

[14] Defendant seems to argue that his prior state drug convictions do not qualify him for career offender status. As previously discussed, *see supra* pp. 26-28, defendant had two prior felony state drug convictions resulting, under 21 U.S.C. § 841, in a minimum sentence of life imprisonment. Defendant admitted at sentencing to both prior convictions.

below the mandatory minimum in defendant's case. *See generally United States v. Hills*, 371 F. App'x 55 (11th Cir. 2010) (holding that a defendant who was sentenced based on a statutory mandatory minimum was not eligible for relief under Amendment 706, which provided a two-level reduction in base offense levels for crack cocaine offenses). Moreover, defense counsel argued at sentencing that defendant should receive a lower sentence than statutorily mandated. (Doc. 170). Defense counsel raised *Kimbrough* at the sentencing hearing, and the court found defendant's case did not merit such a departure. (Doc. 170, pp. 20, 22, 54-58). Appellate counsel was under no obligation to raise a glaringly deficient claim on appeal. Accordingly, defendant's eleventh ground fails.

*Ground Twelve - Defense Counsel's Failure to Inform Defendant of Plea Offer*

Defendant next argues that trial counsel failed to inform him of the government's plea offer before proceeding to trial. (Doc. 182, p. 30). Defendant posits that had counsel informed him of the plea offer, he would not have proceeded to trial and would have accepted the government's plea offer for a "lesser sentence than life in prison." (Doc. 182, p. 30). Defendant also argues that had he accepted the plea offer, the government would not have sought to introduce his prior state convictions and therefore his prison sentence would not have been enhanced. The government acknowledges a plea offer was made, but notes that such a plea offer would have been similar to the one offered to co-defendant Bolware–"plead to a mandatory life sentence and try to work for substantial assistance." (Doc. 191, p. 19). The government also points out that the superseding indictment was filed on June 3, 2008 (doc. 35), the notice of intent to seek enhanced sentences was filed on June 10, 2008 (doc. 41), and plaintiff was arraigned on June 16, 2008 (doc. 45). As such, the

government argues there was no opportunity for plaintiff to plead without the notice of enhancement being filed.[15]  (Doc. 191, p. 20).   Moreover, § 851 allows the government to postpone trial or the taking of a plea of guilty for a "reasonable period" so that sufficient information can be gathered to enable to government to file a notice of enhancement.  21 U.S.C. § 851(a)(1).  Defendant has made no showing indicating the government ever made a plea offer consistent with the defendant's optimistic characterization or that defense counsel failed to bring him such an offer. Accordingly, defendant's twelfth ground must fail.

*Ground Thirteen - Appellate Counsel's Failure to Challenge Defendant's Sentence Enhancement In Light of U.S. v. Sanchez*, 586 F.3d 918 (11th Cir. 2009)

Defendant faults appellate counsel for failing to contest his sentence enhancement based on *United States v. Sanchez*, 586 F.3d 918 (11th Cir. 2009).  (Doc. 182, pp. 33-37).  As discussed previously, the defendant in *Sanchez* was sentenced under 18 U.S.C. § 3559, a statute that requires convictions involve "serious drug offenses" in order to impose a mandatory term of life imprisonment.  18 U.S.C. § 3559(c)(1)(B).  Here, however, defendant was charged under 21 U.S.C. § 841, a statute that only requires defendant be convicted of two or more "felony drug offenses."  *See Watson*, 461 F. App'x at 888-889 ("Section 841(b)(1)(A) provides that a defendant convicted under that section who previously has been convicted of two or more felony drugs offenses shall be sentenced to life imprisonment.").  *Sanchez*, therefore, is inapplicable to the instant proceedings.  Defense counsel, at the

---

[15] Defendant's mental condition initially was at issue.  (Docs. 57, 72, 73).  Until defendant's mental status was resolved, he would have been unable to plead.  As such, defendant would not have been able to plead prior to the government's filing of the notice of enhancement.

sentencing hearing, stressed the different standards for prior drug convictions utilized by 18 U.S.C. § 3559, 21 U.S.C. § 841, and 18 U.S.C. § 924.  (Doc. 170, pp. 38-60). The court found such arguments unavailing and sentenced the defendant, based on the enhancements from prior felony drug convictions, to life imprisonment.  Finally, based on the government's appellate brief (doc. 190-1), defendant's appellate counsel raised a similar argument concerning § 841's "felony drug offenses" requirement versus § 924's "serious" drug offenses requirement.[16]  (Doc. 190-1, pp. 34-35).  Defendant apparently repeats a similar argument in this § 2255 petition because the Eleventh Circuit denied the argument on appeal.  Because defendant's argument has no merit and appellate counsel did in fact raise the argument on appeal, defendant's fourteenth claim fails.

*Ground Fourteen - Cumulative Errors*

Lastly, as to the ineffective assistance litany, defendant claims counsel's cumulative errors violated his Sixth Amendment right to effective assistance of counsel.  (Doc. 182, p. 38).  The validity of cumulative error claims, as premised on the ineffective assistance of counsel, is not in question.  *See Strickland*, 466 U.S. at 694-96 (expressing prejudice inquiry in aggregate terms of reasonable probability counsel's *errors* affected outcome of proceeding); *Ewing v. Williams*, 596 F.2d 391, 396 (9th Cir. 1979) ("Where no single error or omission of counsel, standing alone, significantly impairs the defense, the district court may nonetheless find unfairness

---

[16] Based on the government's appellate brief, the court cannot discern whether appellate counsel raised 18 U.S.C. § 3559's "serious" drug offense sentencing language on appeal.  Given that both § 3559 and § 924 contain the same heightened sentencing language, the issue, in substance, was raised on appeal.

and thus, prejudice emanating from the totality of counsel's errors and omissions."). Nevertheless, defendant has identified no errors of significance nor any prejudice resulting from ineffective assistance on the part of trial or appellate counsel. *See Porter v. McCollum*, 130 S. Ct. 447, 455-56 (2009) (requiring defendant alleging prejudice under *Strickland* to "establish 'a probability [of error] sufficient to undermine confidence in [the] outcome'" (*quoting Strickland v. Washington*, 466 U.S. 668, 693-94 (1984))). The sum of naughts, no matter how many, is still naught. Accordingly, defendant's fifteenth ground fails.

*Ground Fifteen - Defendant's Claims are Not Subject to Procedural Default*

Defendant also seems to argue that his (unavailing) claims concerning 21 U.S.C. § 851 are not subject to default because they are jurisdictional in nature. (Doc. 182, p. 32). Defendant then proceeds to reargue claims he previously raised in ground eleven, *see supra* pp. 26-28. (Doc. 182, pp. 32-33). The government's notice of intent to seek enhancement was appropriate and complied with the applicable notice provisions. *See Ramirez*, 501 F.3d at 1240 (holding that a notice of intent to seek enhancement was valid because it was filed "'before trial, or before entry of a plea of guilty,'" and "informed the defendant that the government was seeking the enhancement, and thus gave him an opportunity to challenge the convictions or adjust his trial and pleading strategy"); *see also Perez*, 249 F.3d at 1266 (noting that the court is tasked with inquiring "whether the information which was filed provided [the defendant] reasonable notice of the government's intent to rely on a particular conviction and a meaningful opportunity to be heard."). A clerical or minor error is not sufficient to invalidate a notice of intent to seek enhancement. *See Perez*, 249 F.3d at 1265-66. Additionally, the notice of intent set out dates, case numbers, crimes

convicted of, and the name of the court in which defendant was adjudicated. (Doc. 41, p. 2). Accordingly, defendant's fifteenth ground fails.

Pursuant to 28 U.S.C. § 2255(b), this court must conduct an evidentiary hearing upon defendant's motion to vacate sentence, "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief . . . ." In support of such motion, however, defendant must proffer credible and specific evidence entitling him to relief. *See Drew v. Dep't of Corr.*, 297 F.3d 1278, 1293 (11th Cir. 2002) (referring to "our clear precedent establishing that such allegations are not enough to warrant an evidentiary hearing in the absence of any specific factual proffer or evidentiary support"); *Hill v. Moore*, 175 F.3d 915, 922 (11th Cir. 1999) ("To be entitled to an evidentiary hearing on this matter [an ineffective assistance of counsel claim], petitioner must proffer evidence that, if true, would entitle him to relief."). Here, defendant's claims are without merit or otherwise refuted by the record. This court may therefore deny the requested relief without an evidentiary hearing. *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) ("A petitioner is *not* entitled to an evidentiary hearing . . . when his claims are merely conclusory allegations unsupported by specifics or contentions that in the face of the record are wholly incredible.") (quotation marks omitted); *Schultz v. Wainwright*, 701 F.2d 900, 901 (11th Cir. 1983) ("An evidentiary hearing is not required where, as here, the district court can determine the merits of the ineffectiveness claim based on the existing record.").

## Certificate of Appealability

Section 2255 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and

if a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2255 11(b).

After review of the record, the court finds no substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, it also is recommended that the court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." If there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully RECOMMENDED:

1. That the motion to vacate, set aside, or correct sentence (doc. 181) pursuant to 28 U.S.C. § 2255 be DENIED.

2. A certificate of appealability be DENIED.

At Pensacola, Florida, this 29th day of August, 2013.

/s/ *Charles J. Kahn, Jr.*

**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of any objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts,* 858 F.2d 698, 701 (11th Cir. 1988).